IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DANIEL WAYNE CLAY,

        Plaintiff,

    v.                                              No. 13-2240-SAC

UNITED PARCEL SERVICE, INC.,

        Defendant.

MEMORANDUM AND ORDER

This employment discrimination case comes before the Court on cross-motions for summary judgment.

**I. Summary Judgment Standard**

On summary judgment, the initial burden is with the movant to point out the portions of the record which show that the movant is entitled to judgment as a matter of law. *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the non-movant must set forth specific facts which would be admissible as evidence from which a rational fact finder could find in the non-movant's favor. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The non-movant must show more than some "metaphysical doubt" based on "evidence" and not "speculation, conjecture or surmise." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986);

*Bones v. Honeywell Intern.*, 366 F.3d 869, 875 (10th Cir. 2004). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether the evidence is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In applying this standard, all inferences arising from the record must be drawn in favor of the nonmovant. *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003). Credibility determinations and the weighing of the evidence are jury functions, not those of a judge. *Id.* at 1216. Nevertheless, "the nonmovant must establish, at a minimum, 'an inference of the existence of each element essential to [her] case.' " *Croy v. COBE Laboratories, Inc.*, 345 F.3d 1199, 1201 (10th Cir. 2003) (quoting *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir.1994)).

## II. Pro Se Lack of Compliance With Rules

The dispositive motion deadline in this case was July 14, 2014. *See* Dk. 55. UPS filed its motion for summary judgment on that date but Plaintiff did not file his cross-motion for summary judgment until August 7th. Additionally, under D. Kan. Rule 6.1(d)(2), plaintiff's response to Defendant's summary judgment motion was due by August 4, 2014. Plaintiff filed it on August 7th as well. In accordance with D. Kan. Rule 56.1(f), UPS sent plaintiff a "Notice to Pro Se Litigant Who Opposes a Summary Judgment Motion," advising Plaintiff that his casecould be dismissed if he did not timely

2

file his response brief. *See* Dk. 58. Plaintiff filed his untimely cross-motion for summary judgment and his untimely response to Defendant's summary judgment motion without seeking a further extension from the Court or consulting with the Defendant. *See* Dk. 60, 61, 62. Therefore, pursuant to D. Kan. Rule 7.4(b), UPS's motion for summary judgment shall be decided as uncontested.

But even if the Court considered the substance of Plaintiff's cross-motion and response to Defendant's motion, Plaintiff would fare no better. Plaintiff has attempted to controvert very few of Defendant's factual assertions, and has done so without citation to the record. Local Rule 56 requires that "[a]ll material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." D.Kan. R. 56.1(a). To specifically controvert facts, the party must number the facts and "must refer with particularity to those portions of the record upon which movant relies." *Id*. Plaintiff has not cited the record in support of any of his facts, and the court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on plaintiff's behalf." *Whitney v. New Mexico,* 113 F.3d 1170, 1173–74 (10th Cir. 1997) (quotations and citations omitted). The court should not be the pro se litigant's advocate, *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991), and will not accept as true conclusory allegations unsupported by factual

allegations. *Oxendine v. Kaplan,* 241 F.3d 1272 (10th Cir. 2001). Accordingly, for this additional reason, the Court considers Defendant's statement of facts to be uncontroverted for purposes of this motion.

This may seem a harsh result to Plaintiff, who acts *pro se*. The Court does construe the substantive pleadings of *pro se* parties liberally. *See Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994). But *pro se* litigants must comply with the procedural rules or suffer the consequences of noncompliance. *See Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) ("This court has repeatedly insisted that pro se parties follow the same rules of procedure that govern other litigants"). This includes the court's local rules. *Calia v. Werholtz,* 426 F.Supp.2d 1210, 1214 (D.Kan. 2006). The rules regarding summary judgment motions are designed to provide procedural fairness to *both* parties. *See Azzun v. Kansas Dept. of Health and Environment*, 2010 WL 4975557 (D.Kan. 2010).

The Court thus examines whether the uncontested facts warrant summary judgment.

## III. Uncontested Facts

UPS has a facility in Lenexa, Kansas where employees fix and repair trailers. Plaintiff began working there in January of 2004 as a utility worker and stayed in that position throughout his employment.

UPS has a zero-tolerance policy regarding workplace violence. Its Professional Conduct and Anti-Harassment Policy states:

> UPS prohibits violent behavior including, but not limited to, physical assaults, fighting, threatening comments, and intimidation. . . . Any comments or behavior that could be reasonably interpreted as an intent to do harm to people or property will be considered a threat.

UPS conducts training with its employees annually and as needed on this policy, and instructs its employees to review the policy and sign an acknowledgement of review.

During the training program, management specifically informed its employees of the following: that UPS prohibits violent behavior, physical assaults, fighting, threatening comments, and intimidation; that any comments or behavior that could reasonably be interpreted as an intent to harm others would be considered a threat; and that employees should contact management if they had a conflict with a co-worker. On October 16, 2008, plaintiff attended UPS's workplace violence prevention program, which took about 30 minutes. Plaintiff signed UPS's workplace violence prevention program document after that training, as well as after similar training in August of 2009.

Defendant terminated Plaintiff's employment four times for workplace violence  - in September of 2009, March of 2011, April of 2011, and September of 2012 - but through the grievance process Plaintiff got each of those terminations reduced to a suspension. As a condition of his suspension in September of 2009, Plaintiff was required to see a licensed psychologist before he returned to work. And as a condition of his suspension in September of 2012, Plaintiff was required to attend an eight-week anger

management seminar before returning to work, and Plaintiff's union gave him a final warning. His lawsuit relates primarily to his fifth termination, which was not reduced to a suspension.

**Plaintiff's Fifth and Final Termination for Workplace Violence**

On March 7, 2013, during a pre-shift fire drill, Carlo Leone, automotive supervisor, saw Plaintiff and co-worker Pascal Kinsey walking about ten feet apart in the parking lot. Leone heard Kinsey tell the Plaintiff to leave him alone and stay away from him. Leone told them to knock the playing off before somebody got serious. Plaintiff and Kinsey separated then walked back into the building without incident after the fire drill.

When the work shift ended at 3:30 a.m., Kinsey went to the parking lot then returned to the building shortly thereafter. He told fleet supervisor Joel Johnson that plaintiff had threatened him in the parking lot by saying he was going to knock him out. Johnson looked outside, saw that plaintiff was no longer in the parking lot, then followed Kinsey out the door and watched him safely leave. Johnson then reported Kinsey's complaint to James Francis.

Soon thereafter, James Francis, Scott Karr (a security manager), and other management representatives conducted a series of witness interviews. Kinsey reported that on March 7th, he and plaintiff had exchanged words and gestures. Plaintiff had made comments about Kinsey's military background and had told him he was "not built right." They continued to

6

exchange words until after the fire drill. When their shift ended at 3:30 a.m., Kinsey went to warm up his vehicle and Plaintiff walked outside and said, "It's 3:30 nigga so now what's up." Kinsey responded, "You need to get in your car and go home. I'm not going to lose my job fooling with you." Kinsey walked back inside and told Johnson that Plaintiff was outside waiting to fight him.

Kenneth Stuteville, plaintiff's co-worker, was also interviewed. He reported that plaintiff and Kinsey had exchanged words during the pre-shift meeting, and that Kinsey had flipped off the Plaintiff. Plaintiff and Kinsey continued exchanging words during the fire drill until Leone told them to stop. When the shift resumed, Stuteville thought that Plaintiff was still upset with Kinsey and told Plaintiff to "let it go or drop it." Stuteville said that around 3:30 a.m. when they left the building, "Daniel made comments to Pascal outside trying to get him to fight." Stuteville heard Plaintiff say, "it's 3:30 now let's fight, let's do this!" Stuteville then saw Kinsey return to the building. Stuteville submitted a written statement of his account.

Plaintiff was interviewed and initially denied making any comments, then stated "I might have made some comments, what." Plaintiff admitted telling Kinsey that he "wasn't built right" and that the two exchanged words. Plaintiff admitted he might have said something to Kinsey, such as: "It's 3:30!" and maybe "let's get out of here." Plaintiff was asked to provide a written statement of his account but refused.

After the investigation, James Francis terminated both Plaintiff and Kinsey effective March 12th. All three of those persons are African American. Francis relied on witness interviews, the investigation report, the witness statements, plaintiff's previous terminations, and plaintiff's history of workplace violence.

On March 18, 2013, Plaintiff filed multiple grievances contesting his termination. At his local hearing on April 9, 2013, Plaintiff claimed that several years earlier he had complained about a confederate flag license plate in a co-worker's rear window in Defendant's parking lot and Darrall Abels had told him that UPS had no control over that. Plaintiff argued that UPS therefore had no power to discipline him for the incident in the parking lot that gave rise to his termination. Plaintiff's union steward, Clint Long, responded that UPS could not control what employees placed on their personal property in the parking lot saying, "you could have a Black Panther sticker and they can't do nothing about it." Wassel echoed, "You can have Black Panther sticker." Offended by that example, plaintiff filed a post-termination grievance on April 9, 2013 - the only grievance he ever filed alleging a racial comment. Plaintiff never complained to either Darrel Abels or James Francis about racial harassment or offensive language on the radio.

Plaintiff filed a grievance contesting his termination but it deadlocked at the local hearing and at the subsequent two-man panel. His grievance

was therefore decided by the Central Region Joint Area Committee in Traverse City, Michigan, where it was denied.

**IV. Motion to Strike**

The court first addresses Plaintiff's motion to strike multiple employee statements that Defendant relies on in its summary judgment motion. Plaintiff contends the statements are inadmissible because they are not in affidavit form, as the relevant rule requires. *See* Fed.R.Civ. Pro. 56(c), (e). Defendant responds that the parties stipulated in the pretrial order to the admissibility of these records.

The pretrial order states the parties stipulated to the admissibility of "Plaintiff's employment records (UPS 252-338; 370-928, 930-935, 941-1005; 1014-1066; 1086-1265)." Dk. 53, p. 2. All of the witness statements that Plaintiff seeks to strike are included within that stipulation. *See* UPS 416, Marlier statement; UPS 266-268, Karr investigative report; UPS 280, 290 Leone statements; UPS 423, Snell Statement; UPS 275, Johnson statement; UPS 371-376, Ferguson investigation report; UPS 575-577, Stuteville statements; and UPS 282, Kinsey statement.

Factual "stipulations are binding on the party who makes them, *see Christian Legal Soc. Chapter of Univ. of Cal., Hastings College of Law v. Martinez,* 561 U.S. \_\_, 130 S.Ct. 2971, 177 L.Ed.2d 838." *Standard Fire Ins. Co. v. Knowles*, \_\_ U.S. \_\_, 133 S.Ct. 1345, 1346 (2013). But "a stipulation on the admissibility of evidence concerns a question of law for the court and

is not binding on the court." *United States v. Dyer*, 752 F.2d 591, 595 (11th Cir. 1985). Nonetheless, most "evidentiary provisions ... are subject to waiver by voluntary agreement of the parties." *United States v. Mezzanatto*, 513 U.S. 196, 115 S.Ct. 797 (1995). This is such a provision, thus Plaintiff is bound by his stipulation. Because plaintiff agreed to the admissibility of the very records he seeks to strike, this motion shall be denied.

## V. Section 1981 Racial Termination

Plaintiff first contends that his termination on March 12, 2013, was based on his race, African American, in violation of 42 USC § 1981.

### A. Direct v. Circumstantial Evidence

Plaintiff contends that the following constitute direct evidence of discrimination: (1) a declaration submitted by Curtis Spaw; (2) UPS's professional conduct and anti-harassment policies; (3) plaintiff's grievances, (4) defendant's admission to [not] terminating or disciplining a white co-worker, but terminating Plaintiff twice and another African American once; and (5) the presence of a confederate flag on a license plate in its parking lot. *See* Dk. 61, pp. 13-14. Spaw's declaration merely offers the union steward's perspective on several incidents involving the Plaintiff. (Dk. 61, pp 54-55).

"Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons." *Danville v. Regional Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002). Such evidence "if believed,

proves the existence of a fact in issue without inference or presumption."

*Hall v. United States Dept. of Labor*, 476 F.3d 847, 854-55 (10th Cir. 2007).

> Direct evidence requires "proof of an existing policy which itself constitutes discrimination," *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477 (10th Cir. 1996) (quotations omitted), or "oral or written statements on the part of a defendant showing a discriminatory motivation," *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000). "A statement that can plausibly be interpreted two different ways-one discriminatory and the other benign-does not directly reflect illegal animus, and, thus, does not constitute direct evidence." *Patten v. Wal-Mart Stores East, Inc.*, 300 F.3d 21, 25 (1st Cir. 2002) (quotation omitted). Statements of personal opinion, even when reflecting personal bias or prejudice, do not constitute direct evidence of discrimination, but at most, are only circumstantial evidence of discrimination because the trier of fact must infer discriminatory intent from such statements. *See Shorter*, 188 F.3d at 1207.

*Hall*, 476 F.3d at 854-55. None of the documents noted above and no evidence of record constitutes direct evidence.

**B. Prima Facie Case – § 1981**

Because Plaintiff has presented no direct evidence of discrimination, the Court relies on the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *See Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991). To make a prima facie case of racial termination absent direct evidence, a plaintiff must generally demonstrate: (1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination. *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir.

11

2012). An inference of discrimination may be shown in various ways, including, "actions or remarks made by decisionmakers," "preferential treatment given to employees outside the protected class," or "the timing or sequence of events leading to plaintiff's termination." *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005).

Defendant contends that Plaintiff cannot show race discrimination because the decisionmaker, Francis, was the same race as the Plaintiff. But the Supreme Court has explicitly rejected a conclusive "same group inference" in the context of race and sex discrimination cases. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (explaining that "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group") (internal quotation marks omitted). *See Saint Francis College v. Al–Khazraji* 481 U.S. 604, 605, 107 S.Ct. 2022, 2023–2024, 95 L.Ed.2d 582 (1987) (rejecting the contention that § 1981 does not encompass claims of discrimination by one Caucasian against another).

Nonetheless, the fact that the decisionmaker and the plaintiff are in the same protected class should not be ignored.

> Although the fact is not dispositive, proof that the decisionmaker is a the same race as the plaintiff considerably undermines the probability that race was a negative factor in the employment decision. *See Kidd v. Greyhound Lines, Inc.*, 2005 WL 3988832, 4 (E.D.Va. 2005) (finding "a strong inference that racial discrimination was not a determining factor for the adverse action" when the person who both

hired and fired the African–American plaintiff is also an African–American"), *aff'd,* 135 Fed.Appx. 615 (4th Cir.), *cert. denied,* 546 U.S. 1006, 126 S.Ct. 629, 163 L.Ed.2d 511 (2005); *Taylor v. Procter & Gamble Dover Wipes,* 184 F.Supp.2d 402, 413 (D.Del.2002) (finding inference of discrimination "less plausible" when the decision-maker is the same race as the plaintiff, making the likelihood that a supervisor's statement evidenced discrimination "remote."), *aff'd,* 53 Fed.Appx. 649 (3rd Cir. 2002); *Rajbahadoorsingh v. Chase Manhattan Bank, NA,* 168 F.Supp.2d 496 (D.Vi.2001) (finding, where plaintiff and decision-maker were of same race, "it is hard to fathom how [decision-maker's] statements could be construed to show that [plaintiff's] termination was racially motivated"); *Kendrick v. Penske Transp. Servs., Inc.,* 1999 WL 450886 at *7 (D.Kan. Apr.13, 1999) (race discrimination case noting, "the plaintiff may have difficulty establishing discrimination where the alleged discriminatory decision-maker is in the same protected class as plaintiff") *aff'd,* 220 F.3d 1220 (10th Cir. 2000); *Anderson v. Anheuser–Busch, Inc.,* 65 F.Supp2d 218, 229 (S.D.N.Y. 1999) (finding fact that plaintiff and a decision-maker were both black "weakens the inference of discrimination"), *aff'd,* 229 F.3d 1135 (2d Cir. 2000).

<u>Almon v. Goodyear Tire and Rubber Co</u>., 2009 WL 1421199 at 7 (D.Kan. 2009). Here, the fact that Francis is the same race as the Plaintiff undermines the likelihood that race was a negative factor in his decision to terminate his employment.

Plaintiff additionally contends that Defendant did not terminate or discipline a white co-worker involved in the same 2011 incident he was, but terminated Plaintiff. For the treatment of another employee to be evidence of discrimination, the other employee must have been similarly situated, which means that "they deal[t] with the same supervisor, [we]re subjected to the same standards governing performance evaluation and discipline, and [were] engaged in conduct of comparable seriousness." *E.E.O.C. v. PVNF,*

13

*L.L.C.,* 487 F.3d 790, 801 (10th Cir. 2007) (internal quotation marks omitted).

Plaintiff apparently refers to the incidents with Ms. Marlier in 2011 or to the incident with Mr. Kronawitter in 2011. But Plaintiff does not show that either of those persons was similarly situated to him. And James Francis, the decisionmaker in the relevant decision (Plaintiff's termination in 2013) was not involved in any of those earlier decisions to terminate the Plaintiff or not to terminate white persons. Instead, the earlier termination decisions were made by Mr. Abels or Ms. Ferguson. Thus no inference of racial discrimination on the part of Mr. Francis can arise from these facts.

Plaintiff also believes that Defendant previously told him its authority to discipline did not extend to the parking lot, yet he was terminated in 2013 for an incident in the parking lot. Here, Plaintiff refers to his complaint to Mr. Abels in November of 2009 that Ms. Marlier had a confederate flag license plate in the rear window of her vehicle, and to Mr. Abels' response that he could not discipline her for that. But management reasonably explained to Plaintiff the difference between permitting an employee to display a flag in her own vehicle and prohibiting employees from fighting in the parking lot. Nothing in those circumstances raises an inference of discrimination.

Plaintiff has not shown other ways in which his termination is suspect. Plaintiff does not allege that the decisionmaker, James Francis, ever exhibited racial animus in his actions or remarks. And Plaintiff had a history

14

of workplace violence for which he had been suspended (post-grievance) four times. As a condition of his suspension in September of 2009, Plaintiff was required to see a licensed psychologist before he returned to work. And as a condition of his suspension in September of 2012, Plaintiff was required to attend an eight-week anger management seminar before returning to work. Plaintiff's union gave him a final warning in September of 2012, yet he engaged in conduct thereafter with Kinsey which other witnesses reported as threatening to fight. Both he and Kinsey were terminated for having engaged in conduct that violated Defendant's zero tolerance policy.

The facts established by the record fail to give rise to an inference of discrimination as is necessary to establish a prima facie case of racial termination.

### C. Pretext

But even if an inference of discrimination is raised, Defendant has met its burden to offer a legitimate, non-discriminatory reason for its decision in stating that Plaintiff was terminated for his violation of its Workplace Violence Policy. And Plaintiff has failed to produce enough evidence to raise a genuine dispute of material fact that the stated reason for his firing was pretextual. Nothing raises a genuine issue of material fact that the given reason was not Defendant's true reason for Plaintiff's termination, but was instead a pretext for racial discrimination.

**VI. Racial Harassment**

Plaintiff also brings a claim of racial harassment under both § 1981 and Title VII.

Title VII and § 1981 proscribe employment practices that "permeate the workplace with 'discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Tademy v. Union Pacific Corp.*, 520 F.3d 1149, 1156 (10th Cir. 2008) (internal citation and quotation omitted). The plaintiff must demonstrate that the work environment was objectively and subjectively offensive, but need "not demonstrate psychological harm, nor … show that [his] work suffered as a result of the harassment." *Walker v. United Parcel Serv. of Am.*, 76 Fed.Appx. 881, 885 (10th Cir. 2003). In addition, to the extent plaintiff alleges racial harassment by a coworker as opposed to a supervisor, plaintiff must establish employer liability for the harassment. This is usually done through a negligence theory that the employer knew or should have known about the conduct and failed to stop it. *Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th Cir. 2012).

The Court examines all the circumstances in determining if an environment is objectively hostile, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

16

interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. at 787–88, 118 S.Ct. 2275 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21, 114 S.Ct. 367) (internal citations and quotations omitted).

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview." *Harris*, 510 U.S. at 21. Similarly, harassment that is not racial or does not stem from animus based on a protected class is not prohibited. *See Chavez v. New Mexico*, 397 F.3d 826, 831–32 (10th Cir. 2005). Thus the law provides no remedy for boorish behavior or bad taste. *Duncan v. Manager, Dept. of Safety, City & County of Denver*, 397 F.3d 1300, 1313-14 (10th Cir. 2005). So incidents spread out over many years which indicate mostly poor taste and lack of professionalism usually do not rise to the level of a hostile work environment. *See, e.g.*, *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1263 (10th Cir. 1998). Such is the case here.

### A. Harassment by Co-workers

Plaintiff appears to allege the following harassing acts or statements by co-workers: in September of 2012, a black co-worker alluded to the size of his own genitalia; two co-workers listened to Rush Limbaugh on the radio all the time and he had to listen as well; a co-worker told plaintiff a joke that used racially offensive terms; and a co-worker (Ms. Marlier) displayed a

confederate flag in the back window of her car in defendant's parking lot. The first two of these have not arguably been shown to have been based on or related to race.

Plaintiff complained about the flag, Defendant investigated it, found no racial animus, and concluded that the employee was free to display the flag in her car window. This was a reasonable conclusion which does not demonstrate race discrimination on the part of the employer. *See Erickson v. City of Topeka, Kan.*, 209 F.Supp.2d 1131 (D.Kan. 2002) (finding employee had free speech right to display confederate flag in car window of parking lot and that such speech did not constitute prohibited racial harassment under Title VII).

Plaintiff refers to one racial joke, but does not allege he ever complained to Defendant about it. But even assuming that Defendant was aware of it, isolated incidents of harassment do not constitute pervasive conduct. *See Braden v. Cargill, Inc.*, 176 F.Supp.2d 1103, 1112 (D.Kan. 2001), citing cases.

### B. Harassment by Management

Defendant also alleges the following harassing acts by management: Jerry Wassel, the labor manager, told him during post-termination grievance hearings that he could put a black panther sticker on his car, and that he had a "sick mind." This latter comment has not been shown to have any relation to Plaintiff's race. The black panther comment was made *after*

18

Plaintiff was terminated and does not raise an inference of discrimination before or at the time of termination. That comment was first made by plaintiff's union steward in a post-termination hearing in 2013, and was immediately repeated by Wassel with the intent of helping Plaintiff understand the difference between his engaging in workplace violence in the parking lot and an employee putting a flag in her car window in the parking lot. These circumstances, although subjectively offensive to the Plaintiff, neither raise a reasonable inference of racial animus on the part of James Francis, nor are they severe or pervasive enough to be actionable harassment. The same is true when one combines the acts of Plaintiff's coworkers with those of management.

IT IS THEREFORE ORDERED that Defendant's motion for summary judgment (Dk. 56) is granted and that Plaintiff's motion for summary judgment (Dk. 60) is denied.

IT IS FURTHER ORDERED that Plaintiff's motion to strike (Dk. 63) is denied.

Dated this 15th day of October, 2014, at Topeka, Kansas.

s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge